AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

07/16/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

7/16/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ clee _____ DEPUTY

United States of America

v.

SERGIO PETRONI,
aka "Serg," and
ZOEY MARTINEZ

Defendant(s)

Case No. **2:20-mj-03331**

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 19, 2020, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2(a) | Distribution of Fentanyl |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Kevin M. Knipp*
*Complainant's signature*

Kevin M. Knipp, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:        July 16, 2020

*Judge's signature*

City and state:   Los Angeles, California

Hon. Steve Kim, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Kevin M. Knipp, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Sergio Petroni ("PETRONI") and Zoey Martinez ("MARTINEZ") for violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2(a): Distribution of Fentanyl.

2.    This affidavit is also made in support of an application for warrants to search the premises located at Room 123 of the DoubleTree by Hilton Hotel San Pedro, 2800 Via Cabrillo Marina, San Pedro, California 90731 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1; a black 2019 Jeep Grand Cherokee, bearing temporary California license plate AL69T08 and Vehicle Identification Number ("VIN") 1C4RJFDJ7KC594498 (the "SUBJECT VEHICLE"), as described more fully in Attachment A-2; the person of PETRONI, as described more fully in Attachment A-3; and the person of MARTINEZ, as described more fully in Attachment A-4.

3.    The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution of and possession with intent to distribute controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances); and 21 U.S.C. § 843(b) (unlawful use of a communication facility in furtherance of drug trafficking) (the "Subject Offenses"), as

described more fully in Attachment B.  Attachments A-1 through A-4 and Attachment B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a special agent with Homeland Security Investigations ("HSI") and have been so employed since May 2018. As a special agent with HSI, I am authorized to investigate crimes involving violations of federal law.  I am currently assigned to the HSI Los Angeles International Airport office where I am assigned to investigate violations of immigration and customs laws including large-scale drug trafficking.

6.    I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.  While there, I completed courses that cover criminal investigative functions, criminal law, immigration law, and customs law, as well as additional training specifically related to the investigation of international narcotics trafficking and related offenses, such as the unlawful importation, transportation, and distribution of

controlled substances.  During the course of my employment with
HSI, I have received several hundred hours of comprehensive,
formal instruction on topics such as drug identification, money
laundering techniques, patterns of drug trafficking, complex
conspiracies, the exploitation of drug traffickers'
telecommunications devices, surveillance, and other
investigative techniques.  I have assisted in investigations
into the unlawful importation, exportation, manufacture,
possession with intent to distribute, and distribution of drugs
and other controlled substances, and conspiracies involving
drugs and controlled substance offenses.

        7.   Prior to my employment with HSI, I was a United States
Customs and Border Protection ("CBP") Officer from 2008 to 2016,
and a CBP Supervisor from 2016 to 2018.  There, I enforced
immigration and customs law, conducted numerous seizures,
collected evidence and worked with criminal investigators from
various agencies.  As a CBP Supervisor, I oversaw the Los
Angeles International Airport Contraband Enforcement Team whose
primary mission was to interdict international trafficking of
controlled substances.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

        8.   HSI and the Redondo Beach Police Department ("RBPD")
are investigating two Fentanyl overdose deaths.  Both deaths
have been linked to the victims' consumption of Fentanyl
supplied by PETRONI.  During recent surveillance, investigators
have seen PETRONI conduct several hand-to-hand drug deals,

including a deal with M.P., who admitted to purchasing $70 worth of Fentanyl from PETRONI and MARTINEZ.

## IV. STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   The Overdose Death of J.S.**

10.   On October 9, 2018, RBPD officers and Fire Department personnel were dispatched to 704 High Lane, Unit A, Redondo Beach, California, in response to the drug overdose of J.S. Officers recovered narcotic paraphernalia in the bathroom next to J.S., including a piece of foil with burn marks on it and a green colored straw.  Based on my knowledge and training this type of paraphernalia is consistent with the use of heroin and other narcotics.

11.   While J.S. was being treated at the hospital, a nurse located a bag containing an unknown substance in J.S.'s shoe. The substance was described as having a rock like texture and was light brown and off white in color.  The substance was tested using a TruNarc testing kit, which indicated the presence of Fentanyl.  The substance was later submitted to the Los Angeles County Sheriff's Department for analysis, and it was determined that the substance contained heroin and Fentanyl.

12.   On October 10, 2018, at approximately 6:31 p.m., J.S. was pronounced dead.  The coroner's report indicated that the immediate cause of death was due drug use and that the death appeared accidental.  The drug-screen portion of the laboratory

analysis summary report indicated that Fentanyl was present in
J.S.'s urine.

13.   In or about November 2018, RBPD Sergeant Strosnider
and Detective Nimmons met with J.S.'s wife, who was in
possession of J.S.'s phone.  J.S.'s wife told the police that
there was an October 10, 2018 text message sent to J.S. from an
individual later identified as J.W.  The text message read, "Are
you good bro."

14.   On December 11, 2018, Sergeant Strosnider contacted
J.W. and asked if J.W. would meet with the police.  J.W. agreed
and met with Sergeant Strosnider and Detective Nimmons at a
Starbucks located in the Torrance, California.  Detective
Nimmons advised J.W. that he was free to leave at any time.
J.W. stated the following:

a.   J.W. had known J.S. for about two years and the
pair had become friends because they both were narcotic users.

b.   On October 9, 2018, J.S. had asked to go with
J.W. to buy Fentanyl because J.S. did not personally know the
dealer.  J.S. drove the pair to San Pedro, California, where
they met with an individual known as "Sergio," later identified
as PETRONI, at the parking lot of Grannies Doughnuts.  J.W.
bought $40 worth of Heroin from PETRONI and J.S. bought $50
worth of Fentanyl.

15.   J.W. also said that PETRONI had recently been arrested
and was in custody.  Using departmental resources, the
investigators learned that PETRONI had been arrested by the
Gardena Police Department on October 31, 2018, for possession of

a controlled substance and possession for sale, as well as on an outstanding warrant for possession for sale.  The report noted that PETRONI was at the Gardena Terrace Inn with his girlfriend, Zoey Martinez ("MARTINEZ"), following a radio call that drugs were left inside a hotel room.

16.   According to the arrest report, PETRONI was driving a 2005 Ford Mustang, California license plate 5UEJ869 and VIN 1ZVHT84N355231738 (the "Mustang"), prior to his arrest.  Police searched the Mustang and found various controlled substances, including Fentanyl, and $10,000 cash inside a small white first-aid kit and a black Adidas backpack.

17.   As further documented in the arrest report, PETRONI was advised of his Miranda rights and agreed to speak with law enforcement.  PETRONI admitted to possessing the controlled substances and cash.  PETRONI also made a statement indicating that he knew what he was doing was bad because people die from the use of drugs.  Gardena Police Department detectives asked PETRONI to whom he sold drugs, and PETRONI replied, "Lots of people."

18.   MARTINEZ admitted to being PETRONI's girlfriend and said that she was aware of his drug possession, but she did not admit to being involved in narcotics sales.

19.   On November 8, 2018, the Honorable Laura C. Ellison of the Superior Court of California, County of Los Angeles, issued a search warrant for the contents of PETRONI's phone seized by the Gardena Police Department.

20.  On PETRONI's phone, Detective Nimmons found text conversations between PETRONI and J.W., from on or about October 4, 2018, to on or about October 8, 2018, including the following:

a.  On October 4, 2018, at approximately 3:32 a.m., J.W. sent a text message to PETRONI stating, "Yo make it a 60 of black and a dime of China please."  Based on my training and experience, black is commonly used as slang for heroin, and China is commonly used as slang for Fentanyl.  At approximately 3:53 a.m., PETRONI responded, "I'm coming."  And at approximately 4:04 a.m., PETRONI texted J.W., "Look for Zoey [i.e., MARTINEZ]."

b.  On October 8, 2018, at approximately 1:35 a.m., J.W. texted, "Hey wya?"  Based on my training and experience, "wya" is commonly used as text slang for "Where you at?"  J.W. then sent two subsequent text messages stating, "we got donuts u want one," and "Yo?"  At approximately 1:50 a.m., PETRONI responded, "She's on her way."

21.  On March 9, 2020, the Honorable Patrick J. Walsh, United States Magistrate Judge, Central District of California, issued a warrant in case number 2:20-MJ-01033 authorizing the disclosure of historical cell-site information from the phones of J.S., J.W., MARTINEZ, and PETRONI, from the time that PETRONI sold drugs to J.W. and J.S.

22.  On March 19, 2020, T-Mobile provided the historical cell-site information for the phones belonging to J.S. and MARTINEZ.  Based on the information from T-Mobile I learned that

T-Mobile only retains cell-site location data for incoming and outgoing phone calls, not for text messages.  As a result, the cell-site information for MARTINEZ's cellphone does not demonstrate any movement between October 7, 2018, at 10:31 p.m., and October 8, 2018, at 10:54 a.m.  Similarly, the only data collected by T-Mobile shows the location of J.S.'s phone in Torrance, California between October 8, and October 10, 2018.

23.   On March 21, 2020, AT&T provided the historical cell-site information for the phones belonging to J.W. and PETRONI. Based on this information, I learned that on October 8, 2018, from approximately 1:35 a.m., to 1:50 a.m., both J.W. and PETRONI's phones were around the location of 2059 Avenue Aprenda, Rancho Palos Verdes, California, with the cell tower located at N33.76692, W118.316, approximately one mile from Grannies Donuts.  As described above, both phones were exchanging text messages during the same time frame.

**B.   The Overdose Death of E.W.**

24.   On April 20, 2020, RBPD officers and Fire Department personnel were dispatched to 1222 South Gertruda Avenue, Redondo Beach, California, in response to the drug overdose of E.W. Officers recovered narcotic paraphernalia located next to E.W., including a piece of tinfoil with burn marks on it and a straw. Based on my knowledge and training, this type of paraphernalia is consistent with the use of heroin and other narcotics.

25.   On April 20, 2020, at approximately 11:39 a.m., E.W. was pronounced dead.  The coroner's report stated that the cause of death was due to Fentanyl intoxication.

26.   On April 20, 2020, investigators spoke with members of
E.W.'s family, who stated the following:

a.   For the past four years, E.W. had been living
with a girlfriend outside California and dealing with substance
abuse issues.  On April 3, 2020, E.W.'s father brought E.W. back
to the family home in Redondo Beach, where E.W. continued to
live until his death.  When E.W. arrived, he was given a cell
phone under his mother's AT&T account.

b.   On April 19, 2020, E.W. was late for a barbeque
at his sister's house.  When E.W. arrived, he said that he had
run into an old friend while on his way.  Family members
recalled E.W. leaving the family residence between 4:30 p.m. and
5:00 p.m., and arriving at his sister's house in Torrance around
6:30 p.m.

27.   E.W.'s mother provided RBPD Sergeant Michael
Strosnider a copy of the phone records pertaining to E.W.'s
phone number.  Sergeant Strosnider noticed that a specific phone
number had been in contact with E.W.'s phone at various times
from April 4, through April 19, 2020.  On April 19, 2020 -- the
day of his sister's barbeque -- E.W. received two calls from
that phone number, the first, at 4:32 p.m., lasted approximately
three minutes, and the second, at 4:44 p.m., lasted
approximately one minute.

28.   Using departmental resources, investigators found that
the phone number belonged to M.P.  Sergeant Strosnider was
familiar with M.P. from a previous criminal investigation.  On
December 31, 2018, M.P. had driven another individual to Redondo

Beach, where M.P. was found to be in possession of heroin, and subsequently arrested.  During a Mirandized post-arrest interview, M.P. told investigators that he used to buy drugs from PETRONI.

29.  On April 21, 2020, the Honorable Efrain M. Aceves, Judge of the Superior Court of California, County of Los Angeles, issued a search warrant authorizing police to search the contents of E.W.'s phone.

30.  E.W. had saved a phone number in his contact list as belonging to M.P.  In addition, there were several phone calls and text messages between M.P. and E.W.  On April 19, 2020, at approximately 4:10 p.m., M.P. sent a text message to E.W. asking, "You down to go to Serg.  I'll throw in 40."  On the same day, at approximately 4:32 p.m., M.P. sent another text message to E.W. stating, "here."  And E.W. responded, "2 seconds."

31.  Based on toll records from T-Mobile Inc., I learned that M.P. made several calls to 310-897-1869 on April 19, 2020, the same day M.P. had used his phone number to text E.W. about meeting "Serg."

32.  Based on toll records from AT&T, I learned that 310-897-1869 is subscribed to Michael Petroni at 3923 Bluff Place, San Pedro, California 90731.  Based on open source and law enforcement databases, Michael Petroni is PETRONI's father, and the address in the subscriber records matched Michael Petroni's address on file with the California Department of Motor Vehicles.  Additionally, I learned from the RBPD that PETRONI

listed Michael Petroni as an emergency contact during a prior law enforcement encounter.

33. Based on my knowledge of this investigation, I believe that "Serg" is short for "Sergio," PETRONI's first name. Because of these text messages and the circumstances of E.W.'s overdose death, I believe that E.W., like J.S., obtained his drugs from PETRONI.

**C.   PETRONI Makes a Hand-to-Hand Drug Deal with T.D.**

34. On May 5, 2020, the Honorable Karen L. Stevenson, United States Magistrate Judge, issued a warrant in case number 2:20-MJ-01986 authorizing the disclosure of historical and prospective cell-site information from the 310-897-1869 number (hereinafter referred to as "PETRONI's Phone").[1]  On June 18, 2020, the Honorable Alka Sagar, United States Magistrate Judge, issued an order in the same case continuing the location monitoring of PETRONI's phone.

35. Between May 11, and May 17, 2020, RBPD investigators used cell-site data from PETRONI's Phone to track PETRONI to the Hampton Inn and Suites located at 1530 Pacific Coast Highway, in Hermosa Beach (the "Hampton Inn").  Investigators also discovered that PETRONI was driving the same Mustang that he had driven during a previous drug-related arrest in October 2018, as well as a black Chevrolet Camaro bearing California license

---

[1] Also, on May 22, 2020, the Honorable Pedro V. Castillo, United States Magistrate Judge, issued a warrant in case number 2:20-mj-02346 authorizing the release of historical cell-site data from E.W. and M.P.'s cellphones.

plate 8JQR779 (the "Camaro"), which PETRONI had rented from Enterprise Rent-A-Car ("Enterprise").

36.   On May 19, 2020, the Honorable Pedro V. Castillo, United States Magistrate Judge, issued orders in case numbers 2:20-MJ-2271 and 2:20-MJ-2277 permitting the use of a GPS tracking devices on, respectively, the Mustang and the Camaro.

37.   On May 18, 2020, investigators conducted surveillance of PETRONI and saw the following:

        a.   At approximately 5:20 p.m. investigators saw PETRONI enter the Camaro, exit the parking lot of the Hampton Inn and drive across the street to the parking lot of the Vons located at 715 Pier Avenue, Hermosa Beach, California. Investigators saw the Camaro park next to a Toyota sedan.

        b.   Investigators then watched as PETRONI conducted what appeared to be a hand-to-hand transaction with the occupant of the Toyota sedan.

        c.   Following PETRONI's departure, investigators stopped the driver of the Toyota sedan, identified as T.D., who was in possession of approximately 0.91 gross grams of suspected Fentanyl.

38.   T.D. was then advised of his Miranda rights and agreed to speak with law enforcement.  He stated the following:

        a.   T.D. met PETRONI in the parking lot and purchased $70 worth of "China," which T.D. explained was a street term for Fentanyl.  This is consistent with my training and experience.

        b.   T.D. has been purchasing Fentanyl from PETRONI for approximately three years.  During that time, T.D. met

PETRONI mainly in San Pedro, but more recently has met with PETRONI all over the greater Los Angeles area.

c.   On May 17, 2020, the day before, T.D. purchased Fentanyl from PETRONI near Interstate 110 and Torrance Boulevard.  T.D. uses approximately $40 worth of Fentanyl a day.

39.   After the interview, the suspected Fentanyl was field tested using a TruNarc testing kit, which came back inconclusive.  Sergeant Strosnider sent the suspected Fentanyl to the Los Angeles County crime lab for testing, and results are pending.

**D.   PETRONI and MARTINEZ Make a Hand-to-Hand Drug Deal with M.P.**

40.   On April 26, 2020, the Honorable John Lord, Judge of the Superior Court of California, County of Los Angeles, issued a search warrant authorizing the installation and monitoring of a tracking device on M.P.'s car.

41.   On May 19, 2020, at approximately 1:00 p.m., investigators followed the tracker on M.P.'s car to the area of Artesia Boulevard and Prospect Avenue in Manhattan Beach, California, and saw the following:

a.   M.P. parked in the lot of a strip mall and the Camaro parked across the street.  PETRONI was in the driver's seat of the Camaro, and MARTINEZ was in the passenger seat. MARTINEZ got out of the Camaro and walked across the street to the strip mall where M.P. was parked.  There, MARTINEZ met with an unknown individual on a bicycle and appeared to conduct a hand-to-hand transaction.

b.   Afterward, MARTINEZ walked over to M.P.'s car. M.P. exited the driver seat, and MARTINEZ handed him a small Ziploc baggie.  M.P. placed the Ziploc baggie in his car and handed money back to MARTINEZ, who then walked back to the Camaro.  Based on my training, experience, and knowledge of the investigation, I believe that such hand-to-hand transactions are consistent with drug deals.

42.  After witnessing the hand-to-hand deal, investigators approached M.P.'s car, identified themselves as police, and asked M.P. where the drugs were.  While approaching the vehicle, Sergeant Strosnider observed an open piece of burnt tinfoil in M.P.'s lap.  M.P. told the officers that the drugs were in the back seat, where investigators found a Ziploc baggie containing approximately 0.53 gross grams of suspected Fentanyl.  The suspected Fentanyl was field tested using a TruNarc testing kit, which came back inconclusive.

43.  M.P. was then advised of his Miranda rights and agreed to speak with law enforcement.  He stated the following:

a.   M.P. admitted to having just purchased half a gram of Fentanyl from PETRONI for approximately $70.  M.P. stated he has purchased half a gram to a gram of Fentanyl once or twice a week from PETRONI for a couple years.  M.P. said that he purchased Fentanyl from PETRONI primarily because PETRONI was one of the "main dealers" of Fentanyl in the area.

b.   M.P. stated that he was "in a bad place" due to the overdose death of his friend, E.W., as described above. M.P. was with E.W. on April 19, 2020, the day before E.W.'s

14

overdose death.  According to M.P., E.W. and M.P. smoked marijuana together before E.W. went to his sister's barbeque. While the two were smoking marijuana, M.P. gave E.W. some of M.P.'s Fentanyl.

        c.    M.P. said that he had purchased the Fentanyl given to E.W. from PETRONI earlier in the day on April 19, 2020.

    44.  Following the interview, Sergeant Strosnider sent the suspected Fentanyl to the Los Angeles County crime lab for testing, and results are pending.

        **E.    PETRONI Makes a Recorded Hand-to-Hand Drug Deal**

    45.  On May 28, 2020, investigators conducted a buy/walk operation using a cooperating defendant (the "CD"),[2] who agreed to meet and purchase $100 worth of Fentanyl from PETRONI.

    46.  At approximately 10:32 a.m., the CD sent a text message to PETRONI stating "Yo."  At approximately 1:29 p.m., PETRONI responded with "Yo what's up."  The CD sent two follow up text messages to PETRONI: "Yo can I pick up?" and "Tryin to get a 100."

    47.  Following the text exchange, the CD placed a phone call to PETRONI that was both recorded and in the presence of investigators.  PETRONI told the CD to meet him at a gas station north of Interstate 10.  At approximately 2:44 p.m., the CD arrived and parked at the corner of La Brea Ave and 23rd Street,

---

[2] The CD is M.P., who, as discussed above, previously has purchased narcotics from PETRONI.  The CD is working with law enforcement for possible charging consideration.  The CD has a prior DUI conviction in California Superior Court and was cited in two separate incidents for possession of a narcotic controlled substance.

near the gas station parking lot.  Investigators searched the CD
and the car for contraband prior to the meeting with PETRONI
with negative results and fitted the CD with a recording device.

48.  At approximately 2:54 p.m., investigators surveilling
PETRONI observed the Camaro drive towards the gas station.

49.  At approximately 2:56 p.m., the Camaro arrived at the
gas station and parked in the lot.  Investigators saw PETRONI
get out of the Camaro and walk toward the front passenger side
window of the CD's car.  PETRONI and the CD conducted a brief
conversation and what appeared to be a hand-to-hand exchange.
Afterward, PETRONI got back into the Camaro and drove east on
Interstate 10.

50.  Investigators followed the CD to a debriefing
location, where the CD gave investigators the suspected Fentanyl
that the CD had purchased from PETRONI.

51.  Investigators tested the suspected Fentanyl using a
TruNarc testing kit with inconclusive results, and sent the
suspected Fentanyl to the Los Angeles County crime lab for
testing.  The lab later confirmed that the substance tested
positive for Fentanyl.

**F.    Identification of the SUBJECT VEHICLE**

52.  On June 8, 2020, I was monitoring the movement of the
Mustang and the cell-site and location data for PETRONI's Phone,
and I noticed that PETRONI's Phone and the Mustang were in two
separate places.

53.  Investigators conducted a moving surveillance on the
Mustang and followed it to a Ralph's grocery store in Marina Del

Rey, California.  Using government databases, I ran a vehicle
registration check on the Mustang and learned that the owner and
address had changed to a new individual who appears to be
unrelated to this investigation.  Investigators saw an unknown
male and female get inside the vehicle and depart the Ralph's
parking lot, and surveillance was terminated.  Based on this
information, I believed that PETRONI may have sold or otherwise
disposed of the Mustang, and was potentially using a different
vehicle.

54.  On June 30, 2020, investigators conducted another
buy/walk operation with the CD, who agreed to meet and purchase
$100 worth of Fentanyl from PETRONI.

55.  At approximately 11:09 a.m., the CD sent a text
message to PETRONI's Phone stating "Yoo."  Shortly thereafter,
PETRONI responded with "what's up."  The CD sent two follow up
text messages to PETRONI: "Trying to pick up.  At work right now
tho I get off around 330" and "Will you be around"?  PETRONI
responded, "yes."

56.  At approximately 3:35 p.m., the CD placed a recorded
phone call to PETRONI's Phone in the presence of investigators,
and the call went to PETRONI's voicemail.  At approximately 3:39
p.m., PETRONI called back and told the CD to meet him at the
Walmart on 190th Street in in Torrance, California.  PETRONI's
return call was also recorded and in the presence of
investigators.

57.  Prior to the exchange, investigators searched the CD
and the CD's vehicle for contraband with negative results.  At

17

approximately 4:41 p.m., the CD arrived at the Walmart parking lot.  PETRONI advised the CD to meet at the nearby Fast5Xpress Car Wash, where PETRONI claimed that he was vacuuming his car. Investigators saw the CD arrive at the car wash and park next to the SUBJECT VEHICLE.

58.  Using law enforcement databases, I learned that the SUBJECT VEHICLE is registered to PETRONI at 3923 Bluff Place, San Pedro, California 90731.  This address is associated with PETRONI's father and was listed on the registration for the Mustang that PETRONI previously drove.

59.  Investigators saw PETRONI get out of the SUBJECT VEHICLE and walk toward the front passenger window of the CD's car.  PETRONI and the CD had a brief conversation and conducted what appeared to be a hand-to-hand exchange.

60.  Investigators followed the CD to a debriefing location, where the CD provided the suspected Fentanyl received from PETRONI.  Investigators tested the suspected Fentanyl using a TruNarc testing kit, and it came back positive for Fentanyl. Investigators sent the suspected Fentanyl to the Los Angeles County crime lab for further testing, and results are pending.

61.  Following the exchange between PETRONI and the CD, investigators watched the SUBJECT VEHICLE.  During that surveillance, investigators saw PETRONI park the SUBJECT VEHICLE next to a black Ford Mustang with an unknown female occupant, enter the front passenger door of the black Ford Mustang, exit moments later, and then drive off in the SUBJECT VEHICLE.  Based on my training and experience, these actions are consistent with

PETRONI conducting a hand-to-hand drug transaction with the unknown woman.

62.  On July 7, 2020, the Honorable John E. McDermott, United States Magistrate Judge, issued a search warrant in case 2:20-MJ-03106 permitting the installation of a GPS tracking device on the SUBJECT VEHICLE.

**G.   Identification of the SUBJECT PREMISES**

63.  On July 16, 2020, cell-site data showed that PETRONI's Phone was in the vicinity of Carson Street and Cravens Avenue in Torrance, California.  At approximately 7:16 a.m., investigators located the SUBJECT VEHICLE parked on Cravens Avenue.  Moments later, investigators observed PETRONI and an unknown female drive away in the SUBJECT VEHICLE.

64.  Investigators saw the SUBJECT VEHICLE enter the Fiesta Car Wash, located at 21623 S Vermont Avenue, Torrance, California 90502.  The unknown female walked out of the car wash and headed north on Vermont Avenue toward an apartment complex. Minutes later, the unknown woman returned to the car wash with an unknown male companion.  Shortly afterward, I saw the SUBJECT VEHICLE head south on Interstate 110.

65.  Due to my location, I was unable to see whether a hand-to-hand transaction had occurred, but I previously observed MARTINEZ conduct what appeared to be a hand-to-hand transaction at the same car wash.

66.  Investigators followed the SUBJECT VEHICLE and saw PETRONI pull into the driveway of 782 West 25th Street, San Pedro, California 90731.  Minutes later, the SUBJECT VEHICLE

pulled out of the driveway and parked curbside on 25th Street.
PETRONI and the unknown woman got out of the SUBJECT VEHICLE,
but investigators could not see which residence they entered.
At approximately 7:50 a.m., I observed PETRONI and the unknown
woman walk back to SUBJECT VEHICLE carrying several bags and
depart east down 25th Street.

67.   Investigators followed the SUBJECT VEHICLE to the
parking lot of the DoubleTree by Hilton Hotel San Pedro (the
"DoubleTree").   PETRONI and his female companion entered the
DoubleTree carrying the bags that they had obtained on 25th
Street.

68.   Based on information from DoubleTree employees,
investigators learned that the reservation for the SUBJECT
PREMISES -- i.e., Room number 123 at the DoubleTree -- is under
the name "Ryan Delfine" with a stated address of 782 West 25th
Street, San Pedro, California 90731.   This appears to be the
same address where PETRONI temporarily parked the SUBJECT
VEHICLE before moving to the curb of 25th Street, as discussed
above.   PETRONI is the second name on the reservation for the
SUBJECT PREMISES.   According to information obtained from the
DoubleTree, PETRONI checked into the SUBJECT PREMISES on the
evening of July 15, 2020, and is scheduled to checkout on
July 17, 2020.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

69.   Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their persons, on their cell phones and other digital devices, in their residences and vehicles, as well as other locations under their control, such as a rented hotel and motel rooms.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these

photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence and vehicles, as well as other locations under their control such as rented hotel and motel rooms.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence and vehicles, including in the form of calendar entries and location data.

e.   Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in vehicles under their control in the event of an unexpected opportunity to sell narcotics arises.

f.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles, as well as other locations under their control such as stash houses and rented hotels and motels.

g.   Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, in safes, or in other locations under their control such as rented hotel and motel rooms.  They also often keep other items related to their drug trafficking activities at these locations and in vehicles under their control, such as digital scales, packaging materials, and proceeds of drug trafficking.  These

items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

　　　　h.　　It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

　　70.　　Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

　　　　a.　　Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

　　　　[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

71.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

     a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

72. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PETRONI and/or MARTINEZ's thumb- and/or

fingers on the device(s); and (2) hold the device(s) in front of PETRONI and/or MARTINEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

73.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

74.   For all of the reasons described above, there is probable cause to believe that PETRONI and MARTINEZ have committed a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2(a): Distribution of Fentanyl.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES, the SUBJECT VEHICLE, and the persons of PETRONI and MARTINEZ, as described in Attachments A-1 through A-4.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __16__ day of
July, 2020.


_____
HONORABLE STEVE KIM
UNITED STATES MAGISTRATE JUDGE